MINER, Circuit Judge:
 

 Defendants-Appellants-Cross-Appellees Donald L. Terwilliger, III (“Donald”) and John Terwilliger (“John”) (collectively “the Sons”) appeal from so much of a summary judgment as awards payment in the sum of $351,586.74, entered in the United States District Court for the Southern District of New York (Casey,
 
 J.)
 
 on the motion of their father, plaintiff-appellee-cross-appel-lant Donald L. Terwilliger, Jr. (“Terwilli-ger”). Terwilliger cross-appeals from so much of the judgment as denied him prejudgment interest. Terwilliger sued the Sons for breach of contract, alleging that the Sons failed to fulfill their obligations under a stock redemption agreement (“Agreement”) entered into by Terwilliger, the Sons, and D.L. Terwilliger Company, Inc. (“Company”). Terwilliger contended that the Sons were liable for monies due under a promissory note (“Note”) issued by the Company as consideration for his controlling shares in the Company, either on the theory that (1) the Agreement constituted a direct contract between the Sons and himself, rendering the Sons personally liable to him for the Company’s default on the Note or (2) the Agreement included the Sons’ guaranty of the Company’s obligations under the Note. The Sons contended that Terwilliger’s only remedy was against the Company, which is now bankrupt. The district court held that (1) the
 
 *242
 
 Sons were liable, pursuant to the Agreement, as guarantors of the Note, (2) Ter-williger was not a third-party beneficiary under the Agreement, (3) a stipulation (“Stipulation”) entered into by the Company and Terwilliger, in settlement of his claims against the Company in the bankruptcy proceeding, did not preclude recovery against the Sons, and (4) Terwilliger’s recovery should not include prejudgment interest.
 

 For the reasons that follow, we affirm the summary judgment in plaintiffs favor on the issue of liability on alternative grounds, vacate so much of the judgment as awards damages and remand for the reassessment of damages and the computation of prejudgment interest.
 

 BACKGROUND
 

 Terwilliger is the former president and majority shareholder of the Company, a New York printing corporation founded by his father in 1948. Terwilliger’s father was the sole shareholder of the corporation until he transferred his stock, as gifts, to Terwilliger, John, and Donald. As a result of these gifts, Terwilliger obtained a controlling interest in the Company while John and Donald obtained minority shares.
 

 In early 1998, Terwilliger decided to retire from the Company. Accordingly, he decided to sell his majority interest in the Company to his two sons, who had worked there for several years and who had been running the business along with their father. However, Terwilliger did not directly transfer the stock to the Sons. Instead, on April 1, 1993, he entered into the Agreement, pursuant to which he agreed to sell his stake, constituting 55% of the outstanding shares back to the Company in return for a $450,000 Note and an immediate payment of $50,000. The Agreement was executed by Terwilliger, by Donald on behalf of the Company, and by John and Donald individually. The Note obligated the Company to pay Terwilliger $8,910 per month for 60 months. The installments included 7% interest, compounded monthly. Under the Agreement, Terwilliger relinquished any right to be an officer or director of the Company. The Agreement also provided for him to receive $8,500 per month for 6]/¿ years in consideration for his agreement not to compete with the Company. After the Agreement was executed, the Sons obtained total control of the Company.
 
 [1]
 
 The most pertinent section of the Agreement for our purposes, and the one discussed at length by all of the parties, is Section 6, which reads as follows:
 

 CREATION OF SURPLUS. If the Corporation shall not have sufficient surplus out of which to make any payment of the promissory note referred to in paragraph 2(b) at its due date, Donald Terwilliger III, John S. Terwilliger and the Corporation shall promptly take all required action to enable the Corporation to make such payment out of surplus. Such action shall include, but not be limited to, recapitalization of the Corporation so as to reduce its capital and increase its surplus, or a reappraisal of the Corporation’s assets to reflect their market value if such value should exceed the asset[s’] book value. If the Corporation’s surplus at the time such action is required to be taken hereunder is not, for any reason, sufficient to make any payment on such promissory note then, within ten days prior to the due date of such payment, Donald Terwilliger III, and John S. Terwilliger shall contribute to the Corporation, in proportion to their respective shareholdings, cash amounts sufficient to create a surplus in an amount at least equal to the amount of such payment.
 

 This language forms the heart of the dispute in this case. Additionally, Section 20 of the Agreement states that it “shall be
 
 *243
 
 construed in accordance with and governed by the laws of the State of New York,” and Section 4 of the Agreement provides that upon the Company’s default on the Note, Terwilliger could, at his election, demand a public sale of the shares held in escrow. However, the Agreement did not permit him to purchase the shares at any such public sale.
 

 Following execution of the Agreement, the Company made 15 payments on the Note, the last of which was in August 1994.
 
 [2]
 
 The failure of the Company to make any further Note payments left a balance due Terwilliger on the Note in the sum of $351,586.74, exclusive of interest. The Sons failed to fund the surplus so as to permit payment on the Note in accordance with the Agreement, either before or after the Company’s default.
 

 The Related Litigation
 

 The 1993 transfer of control over the Company, via the Agreement, spawned several suits. In September 1994, the Sons and the Company sued Terwilliger and the Agreement’s escrow agent, who was also the Company’s accountant, in the Supreme Court, New York County. They sought rescission of the Agreement, asserting that Terwilliger and the accountant had secretly looted the Company of its assets and that the Company and the Sons did not discover this until August 1994. In April 1995, the Supreme Court (Shainswit, /.) dismissed the complaint with prejudice, concluding that the Sons had executed a clear and unambiguous release in the Agreement that barred their claims, and that no action for fraud could be maintained. Then, in June 1995, Terwilliger commenced a separate action in state court, seeking to recover damages from his Sons and the Company arising out of the Company’s and the Sons’ alleged breach of the Agreement and default on their obligations under the Note.
 
 [3]
 
 Terwilliger later dismissed this action without prejudice.
 

 In September 1995, the Company filed for Chapter 11 bankruptcy. Shortly thereafter, it became clear the Company would have to liquidate. Under the Company’s liquidation plan, it was forecast that the Company would only be able to pay unsecured general creditors, such as Terwilli-ger, thirteen to twenty-five cents on the dollar. Terwilliger filed a notice of claim in the bankruptcy proceeding, seeking to collect sums allegedly owed to him under the Note as well as the amounts due pursuant to the Agreement’s non-compete clause.
 
 [4]
 
 A duly authorized committee of unsecured creditors (the “Committee”) challenged Terwilliger’s claims, disputing,
 
 inter alia,
 
 the priority of his claims, and asserting that he may have fraudulently received sums from the Company. The Committee and Terwilliger settled this dispute pursuant to a Stipulation. The Stipulation recognized Terwilliger as a general unsecured creditor in the amount of $237,-500 and authorized payment of that amount in “full satisfaction of any/all the [Company’s] obligations to [Terwilliger].”
 

 The Present Action
 

 On January 14, 1998, Terwilliger commenced the present action, asserting that the Sons had breached the Agreement and owed him the balance due on the Note at the time of the Company’s default, plus interest and costs. On May 15, 1998, the Sons filed a motion to compel arbitration. Terwilliger then moved for summary judgment. The district court (Sotomayor, /.) held a hearing to address both motions on
 
 *244
 
 June 3,1998. The court denied the motion to compel arbitration and denied the motion for summary judgment with leave to renew. The court stated that it would reconsider the summary judgment motion after the parties had rebriefed the issue of the bankruptcy release. In her oral comments from the bench, Judge Sotomayor also stated as follows:
 

 Plaintiff, I read your arguments which say they guaranteed the note. It is not what they guaranteed. They did not guarantee payment of the note as such; they guaranteed a payment to the company of a surplus so that the company could pay the note.
 

 After Judge Sotomayor’s confirmation as a Circuit Judge, Judge Casey took over the case. Thereafter, the parties filed cross-motions for summary judgment and on February 1, 1999, Judge Casey heard oral argument on the motions. At the hearing, Judge Casey noted that in a prior oral argument, Judge Sotomayor indicated that she believed that Section 6 was not a guaranty to Terwilliger on the Note. He stated:
 

 I respectfully disagree with Judge So-tomayor. It is my finding after reading Section 6 of the agreement that it was a guarantee of the promissory note to [Terwilliger.] [Ijn furtherance of my reading of Section 6, I note that Donald ... signed the agreement as president of the corporation and then after [Ter-williger] signed the [A]greement[,] both [Sons] signed their names with no indication that they were signing as officers of the [Company].
 

 Judge Casey also held that Terwilliger was not a third-party beneficiary of the Agreement. Finding that the only remaining issue was the effect of the Stipulation for partial payment of Terwilliger’s claim, the court noted that under the Bankruptcy laws discharge of a debtor does not discharge other persons or entities. The court concluded that “the stipulation and order reducing and allowing the claim of [Terwilliger] does not mention either defendant individually and is more importantly for the purposes of bankruptcy.” Accordingly, the court granted Ter-williger’s motion for summary judgment, assessed damages in the amount of $351,-586.74 with interest from the date of judgment, and denied the Sons’ cross-motion for summary judgment. This appeal followed.
 

 DISCUSSION
 

 The Sons contend that the district court erred in awarding summary judgment to Terwilliger. First, they argue that, contrary to the district court’s interpretation, the plain and unambiguous language of the Agreement illustrates that they have no personal liability to Terwilliger for amounts due under the Note. Instead, they contend that their only obligation was to the Company, and that this duty was extinguished when the Company filed for bankruptcy. Second, the Sons assert that, even if they were personally liable to Ter-williger, the Stipulation signed by Terwilli-ger discharged any obligation the Sons had on the Note to Terwilliger. Third, they contend that, contrary to Terwilliger’s arguments, the prior state court actions should have no res judicata effect on their defense of this action.
 

 We review
 
 de novo
 
 the district court’s decision to grant summary judgment to Terwilliger and deny the Sons’ cross-motion for summary judgment.
 
 See Retrofit Partners I, L.P. v. Lucas Indus., Inc.,
 
 201 F.3d 155, 159 (2d Cir.2000) (applying
 
 de novo
 
 standard in reviewing summary judgment in a breach of contract case);
 
 Bickerstaff v. Vassar College,
 
 196 F.3d 435, 445 (2d Cir.1999);
 
 Kerzer v. Kingly Mfg.,
 
 156 F.3d 396, 400 (2d Cir.1998). Summary judgment is only appropriate when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.
 
 See Celotex Corp. v. Catrett,
 
 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986);
 
 see also
 
 Fed.R.Civ.P. 56(c).
 

 
 *245
 
 I. The Applicable Law
 

 In this diversity action, we apply the law of New York.
 
 See Merrill Lynch Interfunding, Inc. v. Argenti,
 
 155 F.3d 113, 121 n. 5 (2d Cir.1998). The Agreement in question contained a choice of law provision, and “[a]s a general rule, choice of law provisions ... are valid and enforceable in [New York].”
 
 Marine Midland Bank, N.A. v. United Missouri Bank, N.A.,
 
 223 A.D.2d 119, 643 N.Y.S.2d 528, 530 (N.Y.App.Div.1996) (citing
 
 Wyatt v. Fulrath,
 
 16 N.Y.2d 169, 264 N.Y.S.2d 233, 211 N.E.2d 637 (1965);
 
 Swift & Co. v. Bankers Trust Co.,
 
 280 N.Y. 135, 19 N.E.2d 992 (1939);
 
 Bossier Plaza Associates Ltd. Partnership v. Pierson,
 
 156 A.D.2d 246, 548 N.Y.S.2d 507 (N.Y.App.Div.1989)). In this case, all of the relevant considerations counsel in favor of interpreting the Agreement under New York law: Terwilliger is a New York resident, the Company is a New York corporation, New York is the forum state, and, most importantly, the Agreement specifies that it is governed by New York law. Accordingly, we shall apply New York contract law.
 
 See Andy Warhol Found. for the Visual Arts, Inc. v. Federal Ins. Co.,
 
 189 F.3d 208, 214 (2d Cir.1999) (“since New York is the state most intimately concerned with the outcome, New York law governs the disposition of the case”);
 
 Totalplan Corp. of Am. v. Colborne,
 
 14 F.3d 824, 832 (2d Cir.1994) (applying New York choice of law rules to a breach of contract claim and determining that the contract should be interpreted under New York law); N.Y. U.C.C. § 1-105 (McKinney 1993) (as long as a transaction bears a reasonable relation to New York, the parties may agree to have New York law govern their rights and duties).
 

 II. Personal Liability on the Note
 

 Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed.
 
 See Breed v. Insurance Co. of North America,
 
 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978). Construing an unambiguous contract provision is a function of the court, rather than a jury, and matters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument.
 
 See Teitelbaum Holdings, Ltd. v. Gold,
 
 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 396 N.E.2d 1029 (1979). A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous,
 
 Fiore v. Fiore,
 
 46 N.Y.2d 971, 973, 415 N.Y.S.2d 826, 389 N.E.2d 138 (1979), nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case.
 
 See DeVanzo v. Newark Ins. Co.,
 
 44 A.D.2d 39, 43, 353 N.Y.S.2d 29 (2d Dep’t 1974),
 
 aff'd,
 
 37 N.Y.2d 733, 374 N.Y.S.2d 619, 337 N.E.2d 131 (1975). Further, the entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency.
 
 See Laba v. Carey,
 
 29 N.Y.2d 302, 308, 327 N.Y.S.2d 613, 277 N.E.2d 641 (1971);
 
 National Conversion Corp. v. Cedar Bldg. Corp.,
 
 23 N.Y.2d 621, 625, 298 N.Y.S.2d 499, 246 N.E.2d 351 (1969).
 

 Cruden v. Bank of New York,
 
 957 F.2d 961, 976 (2d Cir.1992).
 
 See also Cable Science Corp. v. Rochdale Village, Inc.,
 
 920 F.2d 147, 151 (2d Cir.1990) (in construing contractual language, “a court should accord that language its plain meaning giving due consideration to ‘the surrounding circumstances [and] apparent purpose which the parties sought to accomplish’ ”) (quoting
 
 William C. Atwater & Co. v. Panama R.R. Co.,
 
 246 N.Y. 519, 159 N.E. 418, 419 (1927));
 
 Reda v. Eastman Kodak Co.,
 
 233 A.D.2d 914, 649 N.Y.S.2d 555, 557 (1996) (“Effect and meaning must be given to every term of the contract, and reasonable effort must be made to harmonize all of its terms.... [T]he contract must be interpreted so as to give effect to, not nullify, its general or primary purpose.”) (citations omitted). To prevail on a breach
 
 *246
 
 of contract claim under New York law, a plaintiff must prove ‘“(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.’ ”
 
 First Investors Corp. v. Liberty Mut. Ins. Co.,
 
 152 F.3d 162, 168 (2d Cir.1998) (quoting
 
 Rexnord Holdings, Inc. v. Bidermann,
 
 21 F.3d 522, 525 (2d Cir.1994)).
 

 Before us, the parties have primarily discussed the Sons’ potential liability by reference to the guaranty theory adopted by the district court. We agree with the district court that the Agreement created a personal contractual obligation on the part of the Sons, but reject the district court’s guaranty theory. We conclude that the clear and unambiguous language of the Agreement created a direct contract between the Sons and Terwilliger. The parties’ duties under the Agreement not only ran from the Sons and Terwilliger to the Corporation, and vice-versa, but also from the Sons to Terwilliger, and vice-versa.
 

 Terwilliger agreed to sell his shares to the Company in return for the compensation provided for under the Agreement, including the Sons’ efforts to ensure payment on the Note, and the Sons agreed to ensure that the Company would be able to make its payments on the Note in return for their effectively obtaining total control over the Company’s operations. This intent is not only evident from the circumstances surrounding the execution of the Agreement, which indicate that its practical effect was to sell the Company to the Sons, but also in the unambiguous language of the Agreement. The Agreement specifies that it is a contract “among” Ter-williger, the Company, and the Sons. Additionally, Terwilliger and the Sons signed the Agreement in their individual capacities; Donald also signed in his official capacity on behalf of the corporation. This is a clear indication that the Sons intended to assume a personal obligation pursuant to the Agreement.
 

 The Agreement further provides for Terwilliger to deliver his 989.5 shares in the Company for the sum of $500,000, payable in a $50,000 lump sum and 60 monthly payments pursuant to the Note. By virtue of the Company’s purchase of the shares, the Sons’ prior minority ownership became a controlling ownership of all of the Company’s outstanding shares. In return, they undertook the obligation that “[i]f the Corporation shall not have sufficient surplus out of which to make any payment of the promissory note ..., [Donald and John] and the Corporation shall promptly take all required action to enable the Corporation to make such payment out of surplus.” Agreement, Sec. 6. The Agreement further provides that in the event the Company became unable to make its required payments, the Sons’ duties included contributing “cash amounts sufficient to create a surplus in an amount at least equal to the amount of [the required payment].”
 
 Id.
 
 Thus, the contract terms obligated the Sons to ensure the Company’s timely payments on the Note in return for Terwilliger’s performance of his obligation to deliver valid shares to the Company.
 

 Although we identify a contractual relationship between Terwilliger and the Sons, we reject the district court’s finding that the Sons were guarantors of the Company’s obligations under the Note. A guaranty is “the promise to answer for the payment of some debt or the performance of some obligation, on default of such payment or performance, by a third person who is liable in the first instance ... It is an obligation to answer for the debt of another.” 63 N.Y. Jur.2d Guaranty and Suretyship § 2 (1987);
 
 see also Weissman v. Sinorm Deli, Inc.,
 
 88 N.Y.2d 437, 646 N.Y.S.2d 308, 669 N.E.2d 242, 246 (1996) (“A guaranty ... is a contract of secondary liability ... [A] guarantor will be required to make payment only when the primary obligor has first defaulted.”). Our review of the Agreement compels the conclusion that the Agreement contains no language that would require the Sons to answer directly to Terwilliger for the
 
 *247
 
 Company’s default.
 
 See Compagnie Financien De Cic Et De L’Union Europeenne v. Merrill Lynch,
 
 188 F.3d 31, 34 (2d Cir.1999) (“guarantee agreements are construed
 
 strictissimi juris
 
 under New York law and ... the court must protect the surety against a liability which is not strictly within the terms of the [guarantee] contract”) (internal citation and quotation marks omitted) (alteration in original);
 
 Chase Manhattan Bank, N.A. v. American Nat’l Bank & Trust Co. of Chicago,
 
 93 F.3d 1064, 1073 (2d Cir.1996) (“A guarantor’s obligation must be ‘narrowly construed and cannot be extended by construction beyond the plain and explicit language of the contract.’ ”) (quoting
 
 Key Bank v. Burns,
 
 162 A.D.2d 501, 556 N.Y.S.2d 829, 830 (1990)). Instead, as discussed above, it created a promise by the Sons to Terwilliger to fund the corporate surplus.
 

 Having found a contract between the parties not amounting to a guaranty, we next address the respective obligations of the parties under that contract. Here, it is clear that Terwilliger performed his duties under the Agreement by transferring unencumbered and valid shares to the Company. It is also clear that the Company defaulted on the financial obligations imposed by the Note, and that upon the Company’s default, the Sons breached their duties pursuant to the Agreement to fund the Company to the degree that it would be able to meet its Note payments.
 

 In light of our resolution of the liability issue in Terwilliger’s favor, it is unnecessary for us to address his contentions that he was a third-party beneficiary under the Agreement and that the Sons’ arguments in defense of liability are foreclosed by res judicata. Furthermore, even were we to reach these issues, we would be inclined to reject Terwilliger’s contentions for substantially the same reasons as the district court.
 
 [5]
 

 III. Effect of the Bankruptcy Stipulation
 

 The Sons contend that even if the Agreement created a personal liability on their part, Terwilliger settled
 
 all of
 
 his claims on the Note when he entered into the Stipulation with the Company in the bankruptcy proceeding. We reject that contention and hold that the Stipulation, which discharged the Company’s obligations, did not operate to divest the Sons of liability under the Agreement.
 
 See
 
 11 U.S.C. § 524(e) (“discharge of a debt of the debtor [generally] does not affect the liability of any other entity on ... such debt”);
 
 Green v. Welsh,
 
 956 F.2d 30, 33 (2d Cir.1992) (“the language of these sections [including § 524] reveals that Congress sought to free the debtor of his personal obligations while ensuring that no one else reaps a similar benefit”);
 
 Frost State Bank v. Peavey Co.,
 
 524 N.W.2d 739, 742 (Minn.Ct.App.1994) (“[A] discharge in bankruptcy merely provides the debtor with a personal defense to debt collection actions.... A third party’s liability for debt is unaffected by the debtor’s dis-
 
 *248
 
 charge.”);
 
 Lumbermens Mut. Cas. Co. v. Morse Shoe Co.,
 
 218 A.D.2d 624, 630 N.Y.S.2d 1003, 1004-05 (1995);
 
 Andriani v. Czmus,
 
 153 Misc.2d 38, 580 N.Y.S.2d 123, 125 (1992) (a liability insurer is an “entity” whose liability is unaffected by the discharge of the debtor in bankruptcy);
 
 Macy v. Macy,
 
 714 P.2d 774, 780 (Wyo. 1986).
 

 IV. Damages
 

 Although the foregoing demonstrates that the Sons breached their contractual obligations to Terwilliger, his proper measure of damages is less than clear. We believe that remand is appropriate on this issue so the district court may address whether the Sons should be held liable for the entire amount due on the Note at the time of default, plus appropriate costs and interest, or only some portion thereof under the breach of contract theory that we have adopted. The district court must of course be guided in its assessment of damages by New York law.
 

 The New York Court of Appeals has stated:
 

 [T]he law awards damages for breach of contract to compensate for injury caused by the breach — injury which was foreseeable ... Money damages are substi-tutional relief designed in theory to put the injured party in as good a position as he would have been put by full performance of the contract, at the least cost to the defendant and without charging him with harms that he had no sufficient reason to foresee when he made the contract. In other words, so far as possible, the law attempts to secure to the injured party the benefit of his bargain, subject to the limitations that the injury — whether it be losses suffered or gains prevented — was foreseeable, and that the amount of damages claimed be measurable with a reasonable degree of certainty and, of course, adequately proven. But it is equally fundamental that the injured party should not recover more from the breach than he would have gained had the contract been fully performed.
 

 Freund v. Washington Square Press, Inc.,
 
 34 N.Y.2d 379, 357 N.Y.S.2d 857, 314 N.E.2d 419, 420-21 (1974) (citations and quotation marks omitted).
 
 See also Long Island Contracting & Supply Co. v. City of New York,
 
 204 N.Y. 73, 97 N.E. 483, 486 (1912) (“[T]he plaintiff should have recovered as damages for the absolute breach of the contract by the defendant the difference between the cost of performing the contract and the amount agreed upon as compensation ... ”);
 
 Wakeman v. Wheeler & Wilson Mfg. Co.,
 
 101 N.Y. 205, 4 N.E. 264, 266 (1886) (“One who violates his contract with another is liable for all the direct and proximate damages which result from the violation.... [Damages that are] so remote as not to be directly traceable to the breach, or [are] the result of other intervening causes ... cannot be allowed.”);
 
 Cayuga Harvester, Inc. v. Allis-Chalmers Corp.,
 
 95 A.D.2d 5, 465 N.Y.S.2d 606, 618 (1983) (“In an action for breach of contract [in New York] the ‘injured party is entitled to the benefit of his bargain as written and is entitled to damages for the loss caused by failure to perform the stipulated bargain ...’”) (quoting
 
 Sager v. Friedman,
 
 270 N.Y. 472, 1 N.E.2d 971 (1936)); 36 N.Y. Jur.2d § 45 (“The measure of damages for breach of a contract to pay money at a stipulated time is, in the absence of any special circumstances in the contemplation of the parties at the time of the execution of the contract, the principal sum agreed to be paid by the terms of the contract, with legal interest thereon.”)(footnotes omitted).
 

 In our case, the district court must assess the precise extent of the damages sustained by Terwilliger arising out of the Sons’ breach of contract. First, the district court must determine the effect of the Stipulation on Terwilliger’s damages. Although the district court found, and we agree, that the Stipulation did not extinguish the liability of the Sons, the district court erred in failing to assess the impact
 
 *249
 
 of the Stipulation on Terwilliger’s measure of damages. Instead, it is likely that the district court issued summary judgment in an amount incorrectly exceeding what Ter-williger would have received from full performance of the contract. The district court held that the Sons were liable for “the amount of the outstanding payment remaining on the [Note], $351,586.74.,” plus interest. However, Terwilliger had already received $237,500 pursuant to the Stipulation, a portion of which was attributable to the payments due on the Note. The district court erred in failing to recognize that the amount due Terwilliger from the Sons should have been reduced by the amount paid under the Stipulation. On remand, the district court must also determine what portion of the $237,500 settlement is attributable to the amounts owed on the Note and what portion is attributable to the amounts claimed pursuant to the Company’s obligations under the non-competition clause of the Agreement. The district court must then deduct from Ter-williger’s damages the relevant portion of Terwilliger’s prior recovery from the Company on the Note in the bankruptcy proceedings.
 

 Second, the district court must assess whether the liquidated damages clause, permitting Terwilliger to force a public sale of the shares held in escrow, at his election, could have allowed him to mitigate his damages and, if so, the extent to which his recovery should be reduced to take account of the likely outcome of such public sale. We note that the issues identified above are not exclusive and that it is not our intent to preclude the district court or the parties from addressing on remand other issues germane to the damages question.
 

 V. The Cross-Appeal
 

 Lastly, we find merit in Terwilliger’s contention that the district court erred in failing to award him prejudgment interest. The award of prejudgment interest is a substantive issue governed here by New York law.
 
 See Schwimmer v. Allstate Ins. Co.,
 
 176 F.3d 648, 650 (2d Cir.1999) (applying state law to the question of prejudgment interest in a diversity case). Under New York law, prejudgment interest is generally available.
 
 See Graham v. James,
 
 144 F.3d 229, 239 (2d Cir.1998) (“Under New York law, ‘prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract.’ ”) (quoting
 
 Adams v. Lindblad Travel, Inc.,
 
 730 F.2d 89, 93 (2d Cir.1984) and citing N.Y. C.P.L.R. § 5001 (McKinney 1992)). We find no circumstances in this case warranting any departure from the general rule and direct the district court to include prejudgment interest in its judgment on remand.
 

 CONCLUSION
 

 In accordance with the foregoing, we affirm the district court’s summary judgment in favor of Terwilliger on the issue of liability on other grounds. We vacate so much of the summary judgment as awards damages and remand the case to the district court for the assessment of the appropriate measure of damages due Terwilliger and for the computation of prejudgment interest.
 

 [1]
 

 . Pursuant to the Agreement, Terwilliger's shares were placed in escrow and listed as treasury stock. Before execution of the Agreement, Donald and John had owned 22.8% and 22.3% respectively of the Company’s outstanding shares.
 

 [2]
 

 . The Company had ceased to make its monthly payments of $8,500 under the non-compete clause in April of 1994.
 

 [3]
 

 . Two of the Company’s corporate customers were also defendants. Terwilliger alleged that these customers and the Sons embarked on a scheme to defraud the Company and its creditors.
 

 [4]
 

 .More specifically, Terwilliger sought $318,-343.40 as the outstanding principal on the Note; $24,726, representing accrued interest on amounts due under the Note; $18,210.45 as attorneys’ fees for enforcing his rights under the Note; and $408,000 pursuant to the non-compete clause of the Agreement.
 

 [5]
 

 . Contrary to Terwilliger's arguments, we believe that the prior state court proceedings had no res judicata effect on the Sons’ contention that they never assumed any personal obligation on the Note. To the extent that Terwilliger's argument relies upon his characterization of Judge Sotomayor's statements from the bench as a holding that res judicata applied, we disagree. Instead, we believe that Judge Sotomayor's statements, interpreting the Agreement, were not intended as a final decision, but merely to aid the parties in rebriefing the issues before the court.
 

 Moreover, as our discussion of the Agreement illustrates, Terwilliger was a direct party to the Agreement, not a third-party beneficiary.
 
 See Port Chester Elec. Const. Corp. v. Atlas,
 
 40 N.Y.2d 652, 389 N.Y.S.2d 327, 357 N.E.2d 983, 986 (1976) (requiring proof of an intent to benefit a third party);
 
 Internationale Nederlanden (U.S.) Capital Corp. v. Bankers Trust Co., 261
 
 A.D.2d 117, 689 N.Y.S.2d 455, 460 (1999) (“A third party seeking to recover on a contract must establish that a binding contract exists between other parties; that this contract was intended for his benefit; and that the benefit to him was direct rather than incidental.”).