**Douglas M. CRAM, Plaintiff,**

v.

**PEPSICO, INC., Defendant.**

**No. 99 Civ. 0815 JES.**

United States District Court, S.D. New York.

Dec. 21, 2000.

The Law Offices of Neal Brickman, New York, NY (Neal Brickman, of counsel), for Plaintiff.

Day, Berry & Howard LLP, Stamford, CT (Felix J. Springer, Kenneth W. Gage, of counsel), for Defendant.

**MEMORANDUM OPINION AND ORDER**

SPRIZZO, District Judge.

Plaintiff Douglas M. Cram ("plaintiff") brings the above-captioned action against defendant PepsiCo, Inc. ("defendant") alleging that defendant breached an employment separation agreement between the parties by refusing to allow him to exercise stock options allegedly granted to him pursuant to such agreement. Defendant moves and plaintiff cross-moves for summary judgment. For the reasons that follow, defendant's motion for summary judgment is granted and plaintiff's cross-motion is denied.

**BACKGROUND**

Plaintiff was employed as an attorney in defendant's legal department from September 1973 until early 1998. *See* Notice of Cross Motion dated September 3, 1999, Declaration of Douglas M. Cram dated September 3, 1999 ("Cram Decl.") at ¶ 1. In February of 1998, plaintiff and defendant began to negotiate a separation agreement whereby plaintiff ultimately would leave the company in return for, *inter alia,* a short-term continuation of his salary, vacation pay and a $110,000 separation payment. *See* Douglas M. Cram's Statement of Undisputed Facts dated September 3, 1999 ("Cram Stmt.") at ¶ 14; Defendant PepsiCo Inc.'s Statement of Facts Not In Dispute dated July 21, 1999 ("Pepsi Stmt.") at ¶ 9.

After initial negotiations, on February 10, 1998, defendant provided plaintiff with a first draft of the separation agreement for his review ("the First Draft"). *See* Cram Stmt. at ¶ 16; *See* Pepsi Stmt., Exhibit F, Separation Agreement Draft dated February 10, 1998 ("First Draft") at 1. In addition to providing plaintiff with a short-term continuation of his salary, the First Draft contained a chart that set forth specific details regarding the stock options that plaintiff had outstanding "[u]nder [Defendant's] 1987 Long–Term Incentive Plan and 1994 Long–Term Incentive Plan." *See* First Draft at 2. The chart noted that as of the date of the First Draft, plaintiff "ha[d] outstanding" vested stock options which were granted to him on January 25, 1990 ("the 1990 Options"), January 23, 1992 ("the 1992 Options") and January 27, 1994 ("the 1994 Options"), and unvested stock options which were granted to him on January 25, 1996 ("the 1996 Options"). *See id.* at 2–3. The Chart contained further information in tabular form regarding each set of these options, including the number of options granted on each of the dates, the exercise price for such options, and the vesting and expiration dates for such options. *See id.* Most relevant to this litigation, with respect to the 1990 Options, the chart stated that on January 25, 1990 defendant had granted plaintiff 69,125 options at an exercise price of $8.9717, options which had vested on February 1, 1994 and were to expire on January 25, 2000.[1] *See id.* at 2. The First Draft also stated that plaintiff "had no other awards outstanding, and [that plain-

tiff] will not receive any further awards." [2] *See id.* at 3.

Plaintiff found the First Draft unacceptable and defendant subsequently prepared and presented to plaintiff a second draft of the agreement on February 26, 1998 ("the Second Draft"). *See* Pepsi Stmt., Exh. G, Draft Separation Agreement dated February 26, 1998 ("Second Draft") at 1. The Second Draft included a number of changes requested by plaintiff including a longer time frame in which plaintiff would remain a salaried employee, a delay in the date of plaintiff's retirement and an award of vacation pay. *See* Second Draft at 1, 3. The Second Draft's language concerning the options plaintiff had outstanding, however, remained identical to that contained in the First Draft. *See* Second Draft at 3; First Draft at 2–3.

The Second Draft was also unacceptable to plaintiff, and the parties subsequently entered into further negotiations regarding an additional separation payment. After further negotiation and an exchange of drafts, defendant agreed to make an additional $110,000 separation payment to plaintiff, and the parties executed a final separation agreement on March 24, 1998 ("the Final Agreement"). *See* Pepsi Stmt. at ¶ 9; Pepsi Stmt., Exh. L, Executed Separation Agreement dated March 24, 1998 ("Final Agreement") at 1. Again, the language of the Final Agreement listing the outstanding options held by plaintiff remained identical to that contained in both the First and Second Drafts. *See* Final Agreement at 3; Second Draft at 3; First Draft at 2–3.

1.  The parties agree that on January 25, 1990, plaintiff was granted an option to purchase 10,700 shares of PepsiCo at a stock price of $57.9375, but as of November 1997, this number had changed to 69,125 shares at an exercise price of $8.9717 as a result of stock splits and various corporate transactions. *See* Cram Decl. at ¶ 4; Pepsi Stmt. at ¶ 2.

2.  The First Draft (and all subsequent drafts) reference stock option agreements "evidencing the grant of each of the above described options" and provide that the options will "be

exercisable and expire ... in accordance with their terms." First Draft at 2–3. As defendant notes, the 1987 Incentive Plan (which governs the 1990 Options at issue here) provides that the power to award stock options was vested exclusively in the Compensation Committee of defendant's Board of Directors and that "[n]o awards shall be made under the Plan after December 31, 1997." Pepsi Stmt., Exh. C, PepsiCo. Inc., 1987 Incentive Plan at ¶ 3.

Between February 12, 1998 and March 9, 1998, however, during the circulation and negotiation of the Second Draft and Final Agreement, plaintiff exercised all of the 1990 Options in four separate transactions. *See* Cram Decl. at ¶ 19; Pepsi Stmt., Exhs. H–K, Cashless Exercise Letters dated February 12, 1998, February 23, 1998, February 25, 1998 and March 9, 1998. Plaintiff took no action, however, with regard to the 1992, 1994 and 1996 Options, and such options remained fully outstanding in the quantities specified by each of the First and Second Drafts and the Final Agreement. In exercising the 1990 options, plaintiff communicated with employees in the compensation department who were charged with processing the paperwork for stock option exercises, but never notified any of defendant's employees with whom he was negotiating that he had exercised such options. *See* Pepsi Stmt., Exh. A, Deposition of Douglas M. Cram ("Cram Deposition") at 110–11. Defendant claims that such employees were unaware that plaintiff had in fact exercised the 1990 options during negotiations, and plaintiff concedes that at no point during the negotiations did such employees indicate to him that he would be receiving a grant of additional options as part of the Final Agreement.[3] *See* Pepsi Stmt., Exhibit M, Affidavit of Lucien A. Alziari dated July 21, 1995 at ¶ 4; Cram Deposition at 399–400.

On July 8, 1998, plaintiff attempted to exercise the 1990 options for a second time, claiming that the Final Agreement represented a new and subsequent grant of options identical to those he had previously exercised while his separation agreement was being negotiated. *See* Cram Decl. at ¶ 27. When defendant refused to allow the transaction to be processed, this suit followed. *See id.* at ¶ 31.

## DISCUSSION

▮ Under New York contract law, it is well settled that it is solely within the power of the Court to determine the construction of a plain and unambiguous contract.[4] *See PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir.1996); *see also W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (N.Y.1990). Additionally, "an omission or mistake in a contract does not constitute an ambiguity ... [and][a]n obligation undertaken by one of the parties that is intended as a promise or agreement should be expressed as such and not left to implication." *Schmidt v. Magnetic Head Corp.*, 97 A.D.2d 151, 157, 468 N.Y.S.2d 649 (N.Y.App.Div.1983) (citations and quotations omitted).

This Court may grant summary judgment when, construing all facts in the light most favorable to a non-moving party, it is still clear that no reasonable jury could find in the non-moving party's favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Defendant has moved for summary judgment in reliance upon language contained in the chart of the Final Agreement which outlines plaintiff's outstanding options at the time of his separation. In defendant's view, the parties' placement of language relating to the 1990 options in the chart is an obvious mistake, one caused by plaintiff having exercised such options during the course of negotiations and having failed to

---

**3.** Plaintiff contends, however, that on or about March 13, 1998, during the course of negotiations of the Final Agreement, he informed Lucien A. Alziari, defendant's Vice President of Corporate Human Resources, that he believed he could bring an age discrimination suit against defendant worth approximately $6.0 million and that he would settle such suit for a $3.0 million payment in the separation agreement. *See* Cram Decl. at ¶ 21. Nevertheless, plaintiff admits that he never spoke with anyone negotiating with defendant about an additional grant of stock options in lieu of this sum and that defendant's representative merely informed him that his proposal would be "difficult." *See* Cram Deposition at 347, 399–400.

**4.** The Final Agreement explicitly states that it shall be construed under the laws of New York. *See* Final Agreement at 9.

 

inform the individuals with whom he was negotiating about such exercise. Plaintiff counters in his cross-motion that because such options were listed as "outstanding" despite having been previously exercised, this fact alone permits an inference that an entirely new grant of options was contemplated by the parties.

 It is clear to the Court that the Final Agreement is unambiguous on its face and that the language relating to the 1990 Options was included in the Final Agreement only due to a mistake. Several aspects of the Final Agreement support this conclusion. At the outset, while plaintiff claims that the language relating to the 1990 options represents a totally new grant to him on March 24, 1998, the date of the Final Agreement, the chart lists this grant as having been made on January 25, 1990, a full eight years earlier, *See* Final Agreement at 3. No plausible explanation for this serious discrepancy has been made to the Court, and certainly none that could overcome the only logical conclusion that no new grant was intended. This is especially true since these so-called "new" options became vested on February 1, 1994, four years before the date of the Final Agreement which plaintiff claims granted him these options. *See id.*

Moreover, while plaintiff claims that the 1990 options represent a new grant of options, he does not and cannot credibly claim that the three other listings of options (which are described in identical charts on the same page) each similarly represents a new grant. Rather, as plaintiff agrees, the grants made in 1992, 1994 and 1996, like the 1990 grant, each represents a grant that had been previously made and which plaintiff had outstanding as of the commencement of negotiations. Moreover, like the 1990 grant, each of these other sets of options listed grant dates well in advance of the signing of the Final Agreement, and in the case of the 1992 and 1994 options, each had vesting dates in advance of such signing. The conclusion is inescapable that no evidence or colorable argument supports plaintiff's contention that the 1990 grant should be viewed in isolation and as distinct from these three previous and non-renewed grants, and that any such reading would belie the plain meaning of the Final Agreement. It follows that summary judgment in favor of defendant is warranted.[5]

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is hereby granted, and plaintiff's motion for summary judgment is hereby denied. The Clerk of the Court is directed to close the above-captioned action.

It is **SO ORDERED.**

---

5. While not necessary to support this Court's ruling, it is interesting to note that plaintiff himself could not truthfully state in sworn deposition testimony that he had informed defendant's negotiators that he had previously exercised the options at issue, a fact which lends even further credence to the view that an additional and new grant was never contemplated by the parties. *See* Cram Deposition at 110–11.